Good morning, your honors. My name is Stanley Friedman, and I'm the attorney for the appellant Adeline Ekwebelem, appellant here and defendant below. There's a number of issues that have been presented in her brief. She was convicted after a trial. Significantly, I think, in terms of her Batson claim, the recent United States Supreme Court case of Foster v. Chapman, which was decided May 23rd of this year, after the opening brief but before the reply brief, so it's referenced in the reply brief, is of significant help to her. And there, what the court decided was that notes that were received long after a criminal conviction and upheld by the Georgia Supreme Court could be used to evaluate the defendant's Batson challenge that was made many years earlier. In that case, there was an allegation by the defense of racial selection in terms of the jury. It was a Batson challenge, and it went to the Georgia Supreme Court, which upheld the conviction. Later, under the Georgia Open Records Act request, the defense found notes from the prosecutor, which indicated that there indeed was racial consideration in terms of the prosecution's use of preemptory challenges. And there, the Supreme Court reversed the conviction. In that case, didn't the prosecutor's notes come out and form a central basis for that, that it had shown routine discriminatory preemptory challenges? Yes, Your Honor. That's exactly what happened. Do we have anything like that here? We don't have anything like that here, but what I do point to is the fact that even years later, a court can consider facts that were not available to the trial court at that moment in time in considering a defendant's Batson challenge. And so— What facts are you talking about here? So, for example, the facts here, there was no way for the district court to know, I believe, that the prosecution was going to elicit a reference to the defendant's nationality, the fact that she's of Nigerian origin, and set forth in the briefs. It's our allegation that that prejudiced the defendant. Here, the appellant, there's significant bad publicity about Nigerians and Nigerian scams. So the reference that the defendant was of Nigerian origin prejudiced her, and that would, post hoc, could affect the court's evaluation of her Batson claim. Also, there was no way, I believe, for the district court to know that half of the alleged victims in the case were Latino, and many of them testified through a Spanish-language interpreter. And because of the Batson challenge, there wasn't a single African-American on the jury, but there were, I believe, four Latinos. It's in the brief, but I believe it's four Latinos that sat on the jury. So there was no way for the district court to know, at that moment in time, that ethnicity or race might factor into the case. Now, counsel, you said there were four victims. I mean, the victim in this case is the United States government. It's not the people who were getting the wheelchairs, is it? Well, I think, Your Honor, I stand correct. I think that's right. The United States government, the Medicare system, would be the victim. But there were four witnesses, you were saying? Yes, Your Honor. Okay. Yes, Your Honor. Thank you. And I appreciate that correction. So you're saying the nature of the trial, as it unfolded, demonstrated that there had been, because the government and the defense both knew who the witnesses would be and what race they would be, but the court didn't know that? Well, I don't know that the defense knew. I'm not sure that's in the record. I would assume that the prosecution knew, but I don't think the district court knew that that would be the situation. And so I think that would affect it. Also, the district court wouldn't know that, for example, and we spent some time in the reply brief contrasting juror number three and juror number seven. Juror number three was the sole African-American. Well, there was one gentleman who was disqualified. He was African-American because he had a hearing issue. The only other remaining possible African-American juror was juror number three, and she was the subject of the government preemptory challenge, and there was this batson discussion in front of the district court. And in the briefing, the government states that there's two reasons why juror number three was disqualifying. One was that she expressed some concern about the Medicare system, but ultimately she said that she would be cautious. And it's our suggestion that cautiousness is actually not evidence of prejudice. It's the opposite. We would want jurors to be cautious. That's certainly not a reason to exercise a challenge because a juror said that she would be cautious. The other reason was that she said she had travel plans, but her travel plans are nearly identical to the travel plans of juror number seven, and juror number seven was not the subject of a government preemptory challenge. Her dates of travel were nearly identical. Well, one was two days and one was one day, right? One had to miss one day and one had to miss two. I think that's right, Your Honor, yes. And so, but either way, it would be the same conflict. What the government states is that, well, the concern that she would be angry at the government because, and it's true that generally it's the government that takes most of the time in these trials, but I don't think that's a proper consideration because that's like saying, well, the African-American juror would be more angry with the government than the non-African-American juror. We don't know what race or ethnicity I think juror number seven is. We just know that she's non-African-American. Counsel, can I get back to something you mentioned before? You mentioned that the race of the witnesses should be taken into consideration when determining the prosecutor's motivation for the strikes. Is that right? Yes, Your Honor. Do you have any authority that suggests that that analysis turns on the race of the witnesses in the case? I don't recall anything placed in the brief. I could submit supplemental briefing if the court would, but I do think that to the extent that someone comes in and receives a wheelchair that he or she didn't want and perhaps is taken advantage of, in a sense, while that's not the true victim in the case because it's the United States government, that is somebody who would be sympathetic to a jury and would potentially make racial or ethnic issues part of the case. I guess what I'm asking is that I'm not aware of any cases that when addressing Batson you look at, you know, you have cases where there's a chart of who actually was on the veneer,  and we talked about that, and you raised correctly the case from this last term. I'm not aware of any cases that talk about now let's look at the race of the witnesses and let's chart out who was called, you know, maybe who wasn't called. I just haven't ever thought about that side of the case, looking at the race of the witnesses being called and determining whether a Batson challenge was proper or not. And I was just wondering if you knew any cases that look at the race of the witnesses. I haven't, Your Honor. That's something that I'd like to seek relief from the Court, perhaps, to submit supplemental briefing. I think that's an important issue. If we want any supplemental briefing, we'll notify you. Yes, Your Honor, I appreciate that. Thank you very much. And we don't want you to do work unnecessarily. Thank you very much. I appreciate that. So it's the defense's position that there was certainly enough information at the time that the district court made its decision that it should have upheld the defendant's Batson challenge. But certainly, in light of the Foster v. Chapman case post hoc, the fact that there was racial or ethnic issues in terms of the trial, that it became even more important for that to be the situation, especially when one were to compare jury number three and jury number seven. As Your Honor pointed out, there was a difference in a certain number of days of travel. But the bottom line, basically, is that each one didn't want to serve on the jury. And the government contends that the one jury, jury number three, but perhaps not jury number seven, who was a non-African American, would hold it against the government. And so that would be a structural error, and that alone should result in a reversal. Then there's the safe harbor issue, Your Honor. I do think it's a matter of first impression before the Court. Judge Fitzgerald, I think, properly noted that these other circuits have addressed the issue, but largely they're unreported decisions. There's the case of United States v. Vernon. That's the Eleventh Circuit case. In there, I think I would concede that the headnote makes it very clear that the Eleventh Circuit considered it an affirmative defense. But I think the text of the decision is ambiguous, and it's not so clear that that was the holding of the Eleventh Circuit. Because on pages 1270 to 1271, the Eleventh Circuit referenced Jeff Vernon. There he was the defendant. He says, Jeff Vernon argues that as to Counts 14 through 17, the government's evidence failed to establish that Waters was not a bona fide employee. That suggests that at least the defendant there was arguing that it was the government's burden. And then later in the opinion, the Court does say that it does reference it as an affirmative defense. But in my reading of it, that's at least somewhat ambiguous there. There's reference to United States v. Turner. That's from the Fifth Circuit. That's an unpublished case. United States v. Norton. That's also an unpublished case. There is a published case called United States v. Graber. But respectfully, Your Honor, I don't think that's much authority for this Court because there it just stated that the parties – I'm sorry. There the Court didn't even use the words affirmative defense. And then there's the Eighth Circuit case called Yielding. And that – there it says the parties don't dispute that it's affirmative defense. So that, respectfully, I'm not sure it's that much of a holding. But as a practical matter, what would the indictment look like? Since there's 25 safe harbors, would you – would the – what are you saying that the – if it's not an affirmative defense, what are you saying the government should include in the indictment? Yeah. I thought that was an interesting point. Our position would be the indictment would read the same. But it's like any case, if there's – in fact, here the district court told the evidence that might not come in. It's just up to the district court judge to give an instruction or not give an instruction based on the evidence in the case. So here the defendant indicated that she was going to rely on this particular matter, the safe harbor provision. So if there was evidence in the record of the safe harbor provision, the district court would guide the jury instructions based on the evidence received in the case. So I think the indictment would read the same. And potentially the jury instructions would read the same, but it would just depend on what evidence was admitted to the court. If there's evidence of a safe harbor provision, then there's an instruction that talks about the safe harbor provision. And it's just a question of whose burden it would be. I know there's a number of items in the provision. I disagree with the government that that would have to affect – You're saying the government would have to prove beyond a reasonable doubt that the person wasn't a bona fide employee? Yes. And that's what Congress intended. Wisely or unwisely, Congress has many, many statutes which refers to something as an affirmative defense. And for the government to suggest otherwise, I think the government's asking this court to be a super legislature and second-guess Congress. But it's against logic because you never have – really, we don't have people have the burden of proving a negative generally. Well, it's a procedure that Congress would enact. So for an example, in a bank robbery case, there's Federal Rules of Criminal Procedure 12.1, and there's a whole procedure that's set forth about what the parties need to do, et cetera. So here – and actually, this case would maybe be a good example. The government called witnesses who were – they called marketers. We would call employees. And they testified about the circumstances under which they were paid, and the government was able to meet its burden there. I see that I have about slightly less than two minutes. All right. We'll give you two minutes for rebuttal, if you'd like. Thank you very much, Ron. Thank you. I appreciate your time. May it please the Court. Kristen Williams of the United States. I'd like to start – as the government's indicated in its briefing, this conviction should be affirmed. The claims that the defendant is raising, most of which are subject to plain error, aren't errored at all, especially when considered in the light of the overwhelming evidence, as the district court recognized, of the defendant's guilt of both the helpers. Do you agree with counsel that there's really no difference between the juror who would miss one day, the white juror, and the African-American juror who would have to miss two days? I do not, Your Honor. If you look at the record, the court advised that the trial was going to last either until September 18th or September 19th. Juror number 7's vacation schedule only implicated the last day, which it wasn't clear would even be reached. Whereas the juror number 3's vacation schedule implicated, I believe, the 18th through the 21st. So certainly the trial, as it was anticipated by the parties, but also if the trial ran unexpectedly long, she would be impacted for a number of days there. And also juror number 3 not only had the vacation issue that applied to juror number 7, but had the issue that applied to juror number 13. And I think one of the things, and it may not have – I apologize if it didn't come out as clearly in my brief as I intended, but you can understand why the government struck juror number 3 because of looking at who it struck first. First person – the first perimetry was used was against juror number 13. And juror number 3 – Is that clear from the record? It seems obscure from the record because the judge seems to treat the first perimetry challenge as juror number 3. I apologize. I had thought I had understood from it that it was juror number 13 that we – and I believe that – I'm not sure we're disagreeing with you. It seems like times – I don't know if there's a transcription problem in this case. I saw a couple times it was quoting Judge Fitzgerald as saying the Batson thing, and I think he probably said the Batson showing. So if you could help us understand the transcript because it's a little choppy at times. And I appreciate that, Your Honor. We had recognized the same issues with the transcript. It appeared to have a number of things. There were times in which my co-counsel was indicated as having said something that it was clear from the colloquy that a juror had actually responded in voir dire. So there appear to be some misunderstandings there. My recollection is that juror number 13 was struck first. Be that as it may, even if they were struck in reverse order, the implication is clear. Juror number 13 and juror number 3 are very closely situated. And it goes beyond what the counsel was raising in terms of caution. This wasn't merely about caution. It was, in fact, something that almost raised to the level of a four-cause challenge. When the jurors were asked, juror number 3 and juror number 13 were asked whether in light of their past experiences with Medicare they thought they could – if they thought that wouldn't allow them to be fair, they raised their hand. So in the initial analysis, their initial gut feeling was I'm not going to be able to be fair in light of my experiences. She had 13 years, I believe, of negative experiences with Medicare. And then when the court tried to sort of pull her back in at the very end and say, you know, this – you're going to have to focus on the evidence that's in front of you. You're going to have to look at that. Can you put aside those negative experiences and do that? And her response wasn't what it often is, frankly, in voir dire, which is yes. Her response was equivocal. It says, you know, I would try to do that, but in the end it would probably be, in her words, steered by her experiences. Those suggest that there's going to be a particular issue or sort of baggage that she's going to bring to the table with the entity, which as the court recognized was the victim in this case. It was Medicare, not the particular beneficiaries who were going to testify. And, you know, you have to also sort of look in context with what was coming out in the attorney voir dire conducted by defendant's counsel, which was a sort of a blame the victim. Look at how Byzantine Medicare is. You know, it's really impossible for anybody to follow its rules or its regulations. When you have that kind of defense forming and then you have a juror who appears to be, you know, susceptible to that kind of defense, that's a valid reason. But there are a lot of articles. We've had a lot of these power wheelchair cases. I'm sure you have too. And there are a lot of articles out there that say, I mean, that say that the Medicare bureaucracy itself is what created the opportunity for this kind of thing to have happened, that they weren't checking the they weren't auditing all the bills and they were just paying. But, I mean, it's gotten a lot better over time. It has, Your Honor. And I think what I'm not sure how much of this exactly is in the record, but I think that... It's not in the record in this case, but it's been in the record. It's been in the... Right. It's certainly atmospherics. It's atmospherics for these cases, yes. And I guess the response that I would have to that is, you know, to the extent the argument is that Medicare has really complicated regulations, that's an attempt to blame the victim. If the argument is that the victim hasn't been sort of assiduous enough about stopping the fraud ahead of time, that's one thing, too. But I think neither of those cut to the fraud in this case, which was not simply a It was the evidence that the defendant was actually herself writing the statement of medical necessity and cloning it from person to person, despite them supposedly going to different doctors, having different medical conditions. We had testimony after testimony about that. And that's the overwhelming evidence that none of defendants' claims really reach at all, is touching what was the most damning evidence, which was provided by the defendant's secretary at Adelco, which was Arely Rodriguez. And she talked at length both about the incredibly detailed accounting records. In light of that being the evidence and the record, why would the government think that it had to excuse someone who said, you know, I had trouble, but I would not hold it against them in this case, but I would be cautious? I mean, if you had all that evidence, which is different from some of the cases where it isn't so directly the person authoring the prescriptions themselves that's actually on trial. And the question in some of those cases are, was it really necessary or not? And I understand that, Your Honor. And, you know, the government always goes into the trial confident in its evidence, but also cognizant that juries view evidence different from the way we do. And so I don't think we could necessarily know, you know, at the beginning that that evidence was going to seal the deal for the jury. And so instead, we had to look to, you know, we've got a juror who, when first asked, her gut reaction is, I can't be fair. You know, she's later sort of, you know, asked further questions about that, but then she still gives the equivocal answer that it's not just caution. It's about steering, you know, that it would steer how she would proceed. And so then you have that combined with the fact of the prepaid vacation, the fact that her vacation, unlike that of juror number 7, is certainly going to implicate the trial as the parties anticipate to go. And it most likely would be the government's case. And, in fact, you know, it was the government that used up, you know, the majority of the time here. And, you know, those reasons which were presented, even though the Court didn't find that there had necessarily been a prima facie case shown, that this was the first, you know, preemptory strike of an African-American juror, but nonetheless asked us to provide our racially neutral reasons. We did. And then the Court, which had the ability both to assess our demeanor in making those reasons, but also assess the voir dire and the jury panel as a whole, that particular juror's demeanor. During the questioning, my recollection, actually, is that juror, you know, there was initially a thought that she might have, that she might be sort of a juror who was more sympathetic to the government's case because there was sort of an initial, I think she said that her mother had been approached for a power wheelchair, and so that would make her sort of similar to some of the beneficiaries in this case. But then it sort of just went on and on and on about the problems with Medicare that came in trying to fix that. But didn't Juror 13 do the same thing? And the government struck Juror Number 13 for the same reason. For the same reason. And so that actually provides the support for the fact that the racially neutral reasons that were offered by the prosecutors were actually, in fact, the reasons that were behind the preemptory. And I think the defense counsel's, or appellate counsel's, pointing to the Chapman case really is in a posit here because that case, as the Court recognized, concerned notes that later showed an improper purpose that the prosecutors had. We have nothing like that here. In fact, the context of it suggests that the government meant what it said in terms of why it was excusing this particular juror. So for those reasons, there is no error here, much less plain error. Because as I said, the objection to the process, or to the racially neutral reasons, to the extent there was an objection made, it wasn't to that, it wasn't to the process, and it came later. So under this Court's authority in Chanko, if it had come at the time, the prosecutor could have explained more, could have sort of used more than simply the word precaution, but could have explained about the steering, about the initial lack of fairness, and so forth. So again, I think we are under a plain error standard of review on this, but there's no error in either event. Is there anything further you want to talk about? Not unless the Court has any questions. Very well. Thank you, Your Honor. Thank you. I appreciate the opportunity for a brief reply. I just had two points I wanted to make, if I may. In terms of the jurors, the district court did really an excellent job, probably being a former federal prosecutor, of canvassing the jury to see whether any of them would be unfair. And so, and it's the colloquies included on page 10 of the reply brief, and the judge has a very nice questioning of the jury, and he says, you know, could anybody, will anybody be unfair? And he says in the record, you know, I'm seeing no hands. And he said, is there anybody out there who would be unable to be, or not able to be fair to both sides? And he says, I see no hands. So when the government says, and the jury was sworn. So when the government says, well, juror number three would not be fair, in a sense, her sworn testimony was otherwise, because the judge asked the whole panel, is there anybody there who would be unfair? Your Honor, didn't she raise her hand? Counsel told us that she had raised her hand, as had one other juror. Well, maybe that was at a different time, but at least the section that I'm citing in the appellant's excerpt selected. But you're not saying that didn't occur? At one point he asked whether something about fairness and two jurors raised their hands? Is that not true? I don't recall it being the reference that the government, I wasn't the trial lawyer, but the reference that the government makes. Well, I know, but that doesn't. I don't remember being. Everybody's supposed to be fully familiar with the entire record. Yes, Your Honor. Trial lawyer or not. I don't think it was that clear, Your Honor. I think what's clear is that the juror indicated that she would be fair. And everything else was uncertain. And then in terms of plain error, Your Honor, respectfully, I would just suggest that her counsel was conflicted. So whether the court uses the plain error standard or not, it should consider whether, indeed, her counsel was conflicted. But the counsel has, there's a letter, an e-mail in the record confirming that she had been made aware of the conflict and that she had agreed that, nevertheless, to continue with Mr. Kaplan. It had been done orally. There's the e-mail and there's also the declaration by the defendant where she states that. But it was done orally. It wasn't done in writing. And it wasn't done with any of the specificity that normally I think courts would require. And typically, a court would make an inquiry of the defendant and hear that the court was deprived of doing that because it wasn't made aware of the conflict. The court was told that the corporate entity was a client of Mr. Kaplan. But not. Were Action and Motley also prosecuted? Not that I know of, Your Honor. I'm not aware of them being prosecuted. I don't think it's in the record. I think that, as far as I know, they were investigated. And I think that's what's, how the record is. Thank you, counsel. Thank you very much, court. Thank you very much for the time. The case is argued and will be submitted. Yes, Your Honor.
judges: Reinhardt, Wardlaw, Owens